IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARINKA PESCHMANN, | ) | |
| | ) | |
| Plaintiff | ) | Case No. 1:17-cv-00259 (Erie) |
| | ) | |
| vs. | ) | SUSAN PARADISE BAXTER |
| | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| | ) | RICHARD A. LANZILLO |
| STEPHEN QUAYLE, DOUGLAS | ) | UNITED STATES MAGISTRATE JUDGE |
| HAGMANN, DOES 1-20, | ) | |
| | ) | |
| Defendants | ) | REPORT AND RECOMMENDATION ON |
| | ) | DEFENDANTS' MOTIONS TO DISMISS |
| | ) | [ECF NO. 106; ECF NO. 108] |

I.      Recommendation

It is respectfully recommended that the Defendants' Motions to Dismiss [ECF No. 106;

ECF No. 108] be **GRANTED in part and DENIED in part**.

II.     Report

A.      Introduction and Background

Plaintiff Marinka Peschmann (Peschmann), a Canadian citizen, has filed an eleven-count

Second Amended Complaint asserting defamation, misrepresentation and related claims against

Defendants Douglas Hagmann (Hagmann) and Stephen Quayle (Quayle) as well as several "John

Doe" defendants.  Peschmann makes her living as a freelance reporter, but has also worked as a

ghostwriter and collaborator on various media projects, primarily operating in the political arena.

Her work brought her into contact with Hagmann and Quayle, operators of various Internet

media outlets.  At the request of the editor of the online Canada Free Press, Peschmann wrote an

article about Hagmann for publication on that site.  Peschmann claims information provided by

Hagmann and upon which she based her article was false.  She later issued public retractions of

1

her article. The Defendants took issue with those retractions and the parties' relationship turned adversarial. This litigation ensued. Before the Court today are Motions to Dismiss filed by both named Defendants.[1]

B.       Motions to Dismiss

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). After *Iqbal,* it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. *Id.* at 663; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, n.14 (3d Cir. 2013) (citing *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, n. 27 (3d Cir. 2010)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Applying the principles of *Iqbal* and *Twombly*, the Third Circuit in *Santiago v. Warminster Twp.*, 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

---

[1] This case has been referred to United States Magistrate Judge Richard A. Lanzillo for pretrial proceedings in accordance with the Magistrates Act, 28 U.S.C. §§ 636(b)(1)(A) and (B), and Local Rule of Civil Procedure 72.

*Id.* at 130 (quoting *Iqbal*, 556 U.S. at 675, 679). "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir.2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009) (citing *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234–35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679. The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "In short, a Motion to Dismiss should be granted if a party fails to allege facts which could, if established at trial, entitle him/her to relief." *Hill v. Cosby*, 2016 WL 247009, at *2 (M.D. Pa. Jan. 21, 2016) (citing *Twombly*, 550 U.S. at 563 n. 8)).

C.      The Second Amended Complaint and Federal Rule of Civil Procedure 8.

Because Peschmann is proceeding pro se, her submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Although the Court is sensitive to Peschmann's pro se status, the Second Amended Complaint tests the limits of that tolerance. As noted in its Table of Contents, the Second Amended Complaint, without exhibits, is one hundred and thirty-five pages in length. It consists of five hundred and thirty-seven paragraphs, one hundred and twenty-four footnotes, and forty-three exhibits, which add approximately two hundred and fifty additional pages to the pleading and bring its approximate total length to three hundred and

eighty-eight pages. More importantly, the substance of the pleading demonstrates that its verbosity is not due to a complex or protracted factual background demanding great attention to detail and corresponding length. Rather, Peschmann uses her pleading, in large part, as a soapbox to advance journalistic grievances against the Defendants instead of as a means to state concisely and directly the facts upon which she bases her claims. As the Court of Appeals for the Third Circuit has explained, "there are limits to our procedural flexibility . . .. At the end of the day, [pro se litigants] cannot flout procedural rules—they must abide by the same rules that apply to all other litigants." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013). "[E]xtending too much procedural leniency to a pro se litigant risks undermining the impartial role of the judge in the adversary system." *Id.*, quoting Julie M. Bradlow, *Comment, Procedural Due Process Rights of Pro Se Civil Litigants*, 55 U. Chi. L. Rev. 659, 671 (1988).

Federal Rule of Civil Procedure 8 sets out the general rules governing pleadings in federal court. It commands that any "pleading that states a claim for relief must contain ... *a short* and *plain statement* ... showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). Further, the Rule clarifies that "each allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). The allegations of Peschmann's Second Amended Complaint are not stated simply, concisely, or directly. Indeed, its unnecessary length and gratuitous commentary approach the ridiculous.[2] It is far from the "short" and "plain" recitation contemplated by Rule 8(a), and the Court would be justified in dismissing it for failure to comply with that rule. *See Venezia v. Union Cnty. Prosecutor's Office*, 2011 WL 2148818 (D.N.J. May 31, 2011) (dismissing an amended complaint for failure to comply with Rule 8(a) because the

---

[2] This Court finds it questionable, at best, whether any Complaint requiring a 2-page table of contents can be considered "short" within the meaning of Rule 8.

allegations were not short, plain, concise and direct, and the amended complaint "present[ed] a dense rambling thicket of statements over the course of fifty-five pages, as well as 200 pages of exhibits[.]"); *Binsack v. Lackawanna Cnty. Prison*, 2010 WL 4973309, \*4 (M.D. Pa. Oct. 14, 2010) (recommending dismissal of complaint for violating Rule 8 where pleading was eighty pages, two hundred twenty-three paragraphs, and forty footnotes.).[3]

Given Peschman's pro se status and the Court's preference for deciding controversies on the merits, however, it is recommended that the Court address the substance of her claims and not dismiss or strike the Second Amended Complaint based upon its failure to comply with Rule 8(a). *See Howe v. Litwack*, 2013 WL 3305994, \*6 (D.N.J. June 30, 2013) (finding that the complaint failed to comply with Rule 8(a) but reviewing the sufficiency of the complaint). As noted below, it is recommended that certain of Peschmann's claims be dismissed without prejudice to her opportunity to file an amended pleading in an effort to cure the defects identified herein. It is further recommended that Peschmann be instructed that full compliance with Rule 8(a) will be required of any amended pleading she may file in the future.

D.     The Second Amended Complaint

1.     Factual Allegations.

Accepting the allegations in the Second Amended Complaint as true and viewing them in the light most favorable to Peschmann, the Court summarizes its relevant allegations as follows. Peschmann is a citizen of Canada and works as a reporter and writer. ECF No. 103, ¶ 1. Defendant Hagmann is a resident of Erie, Pennsylvania, and a citizen of the Commonwealth of

---

[3] *See also Thompson v. Bick*, 2017 WL 999467, \*6 (E.D. Cal. March 14, 2017) (144-page complaint not short and plain as required by Fed R. Civ. P. 8(a)(2)); *Washington v. Client Network Services*, 2016 WL 1592693, \*6-7 (E.D. Pa. April 20, 2016) (Third Amended Complaint which incorporated a 294-page attachment neither short nor plain for purposes of Rule 8); *Fifth Third Bank v. Double Tree Lake Estates, LLC*, 2014 WL 3659780, \*11 (N.D. Ind. July 23, 2014) (Second Amended Complaint is not short and "is the farthest thing from plain.").

5

Pennsylvania. *Id.* at ¶ 2. Hagmann and his son co-host "The Hagmann and Hagmann Report," a three-hour show which is broadcast on the Internet through various platforms such as Youtube.com, BlogTalkRadio, SoundCloud.com, and iTunes.com. *Id.* This broadcast allegedly is heard by listeners in more than one hundred countries and surpassed seventy million downloads in 2018. *Id.* Hagmann is also a licensed private investigator in the Commonwealth of Pennsylvania. *Id.* at ¶ 3-4. Peschmann describes Hagmann as a self-identified investigative journalist, a multi-state private investigator, a surveillance specialist, and an informational and operational asset for various federal and state law enforcement agencies, including the Federal Bureau of Investigation. *Id.* at ¶ 6. Hagmann is also a "senior columnist" at Canada Free Press, and is that publication's crime and terrorism editor. *Id.* at ¶ 7. He is the author of two books. *Id.*

Quayle is a resident of the State of Montana. *Id.* at ¶ 8. According to the Second Amended Complaint, Quayle is an "internationally known radio talk show media personality," a "Christian apologist," a "self-described Christian watchman," and a regular guest on Hagmann's broadcast. *Id.* Quayle is also the author of several books as well as a filmmaker, and a purveyor of survival gear, guns, and precious metals. *Id.* at ¶ 9.

On June 3, 2013, Judi McLeod, the owner, editor and publisher of Canada Free Press, contacted Peschmann. *Id.* at ¶ 22. McLeod told Peschmann that Hagmann, one of her senior columnists, "had been targeted by [the United States] National Security Agency." *Id.* Hagmann claimed to have learned about this targeting after concluding a phone call with Quayle regarding efforts to "to ostensibly identify his [Hagmann's] DHS (Department of Homeland Security) and United States government intelligence sources." *Id.* at ¶ 24. Hagmann allegedly memorialized his claim that he had been targeted by the NSA in a sworn affidavit, an unverified copy of which

McLeod sent to Peschmann.[4]  *Id.* at ¶ 34.  Vouching for Hagmann, McLeod assigned Peschmann the story.  *Id.* at ¶ 35.  Peschmann wrote an article about this alleged targeting, submitting it to McLeod on June 4, 2013.  *Id.* at ¶ 43.  The Canada Free Press published Peschmann's article, entitled "How Extensive is the NSA Domestic Surveillance of U.S. Media?  Is it legal?" that morning.  *Id.* at ¶ 44.  Hagmann then disseminated Peschmann's article through various social media outlets.  *Id.* at ¶ 45.  Peschmann further offered to assist Hagmann by making Freedom of Information Act (FOIA) inquires on his behalf.  *Id.* at ¶ 47.

Unbeknownst to Peschmann, Quayle held a fundraiser on his website for Hagmann and also published an article entitled "A Request to Stand by Doug Hagmann Financially."  *Id.* at ¶ 49.  Peschmann alleges that the Defendants used her article to support their fundraising efforts.  *Id.* at ¶¶ 50-84.

---

[4] This document provides greater detail about Hagmann's claim of NSA surveillance. Hagmann states, in pertinent part, that he "received a telephone call (landline to landline) from Steven Quayle, also a citizen of the United States. As documented by your affiant's telephone system, this unscheduled conversation lasted exactly 16 minutes and 17 seconds, from 11:50:05 hours ET to 12:06:22 ET, and included but was not limited to information obtained from a high level source within the U.S. Department of Homeland Security (hereafter referred to as DHS) known publicly under the pseudonym 'Rosebud.' This source has previously provided concise and accurate information about the inner workings of DHS as well as the activities and agendas of various individuals in that agency. It was during this conversation that your affiant shared specific information about the latest contact with this source that is in the process of being transcribed for future publication." ECF No. 103-1, at 3. Hagmann further stated that "[s]ubsequent to the telephone conversation that concluded at 12:06:17, your affiant replaced the receiver on the telephone. At that moment, the telephone emitted a short ring, perhaps best described as a muffled ring or "chirp." Initially, your affiant believed it to be a simple ring-back, must like those accidentally experienced during the course of otherwise normal telephone use. It is important to note, however that the sound made by the telephone did not have that same characteristics as a ring back. Curious because of the ring tone, your affiant looked at the caller ID displaced and was startled to see the following on the telephone caller ID screen: 'UT NSA DATA REC CTR.' Your affiant immediate [sic] muted the telephone and picked up the receiver, hearing the following message in a male voice: '. . . your notification that the Utah NSA Data Recording Center successfully captured this landline communication under file # [I was unable to copy the numbers as they were spoken quickly]. Refer to senior duty officer for access code under file # [this appeared to be a different alpha-numeric sequence]." *Id.* Then, Hagmann relates that "After the final number was spoken, your affiant heard a distinct 'click' on the line, followed by silence. Interestingly, the caller ID information completely disappeared from the telephone at the instant of the 'click. Accordingly, your affiant has no photographic documentation to illustrate or verify the information provided herein. Additionally, the redial capabilities of your affiant's telephone were rendered non-functional following this event." *Id.* at 4.

Out of concern for her publication's credibility and alarmed by the Defendants' fundraising efforts, McLeod told Peschmann about an incident where Hagmann had "made news up." *Id.* at ¶ 84. She claims that Hagmann had done so while appearing as a guest on Alex Jones's Infowars.com. *Id.* Peschmann told McLeod that she would have to publish the results of the FOIA requests Peschmann made on Hagmann's behalf—whatever was revealed. *Id.* at ¶ 85.

After Peschmann obtained additional information undermining the credibility of Hagmann's NSA surveillance claim, she retracted her story, publishing an article on her own website: "Did Doug Hagmann make up his NSA allegation he asked me to report?" *Id.* at ¶ 110. After Peschmann obtained from Quayle additional evidence further negating the veracity of Hagmann's claim, she published two additional retraction articles. *Id.* at ¶ 112. After the publication of one of these retractions (November 19, 2014), Quayle called her one of "hell's messengers," and held a fundraiser asking his patrons to "tithe" and send offerings to Hagmann. *Id.* at ¶ 117.

Hagmann and Quayle responded to Peschmann's retraction articles on February 10, 2015. Peschmann claims the Defendants, working in concert, "manufactured another fear-based, false narrative, and phony conspiracy" which they used to defame, threaten, and incite violence against her. *Id.* at ¶ 118. Among other things, Peschmann claims they defamed her on both their Internet broadcast and in an article posted on their website. *Id.* at ¶¶ 120-125.

      2.    Procedural History

Peschmann initially filed suit, pro se, in New York state court on November 9, 2015. The case was removed to the United States District Court for the Southern District of New York on December 4, 2015. ECF No. 1. Peschmann filed an Amended Complaint on January 15, 2016. ECF No. 27. After granting a motion to dismiss several defendants, that Court transferred the

case to this Court on September 22, 2017. ECF No. 69. Hagmann and Quayle remained as

defendants and moved to dismiss Peschmann's complaint on December 15, 2017. ECF No. 82,

ECF No. 84. The Court held a status conference on August 13, 2018 and afterward dismissed

the Defendants' motions to dismiss without prejudice and permitted Peschmann to file a Second

Amended Complaint. ECF No. 99. Peschmann filed a Second Amended Complaint on

October 1, 2018. ECF No. 103. That document is the operative pleading. The Defendants

renewed their motions to dismiss on December 10, 2018. Peschmann filed a brief in opposition

on December 31, 2018. ECF No. 111. The Defendants filed replies on January 14, 2019, (ECF

No. 113, ECF No. 117), and the Motions to Dismiss are now ready for disposition.[5]

    E.    Analysis of the Claims

        1.    Choice of Law

This Court has jurisdiction over this action under 28 U.S.C. § 1332 because there is

complete diversity of citizenship among the parties and because the amount in controversy

exceeds $75,000. Because it has diversity jurisdiction, the Court must determine the applicable

substantive law. *See, e.g., Kraus Industries, Inc. v. Moore*, 2007 WL 2744194, *3-4 (W.D. Pa.

Sept. 28, 2007) (citation omitted). To do so, this Court looks to the choice of law rules of the

forum state, *i.e.*, the Commonwealth of Pennsylvania. *Id.* (citing *Klaxon Co. v. Stentor Electric

Mfg. Co.*, 313 U.S. 487, 496 (1941). Under Pennsylvania choice-of-law rules, "the first question

to be answered in addressing a potential conflict of laws dispute is whether the parties explicitly

or implicitly have chosen the relevant law." *Henkel Corp. v. Hartford Accident & Indemnity

Co.*, 399 F.Supp.2d 607, 611 (E.D. Pa. 2005) (citing *City of Philadelphia v. One Reading Ctr.*

---

[5] The Defendants have also filed Motions to Strike portions of Peschmann's Response in Opposition to their Motions to Dismiss. See ECF No. 114, ECF No. 116. Those motions will be resolved in a separate order.

*Assoc.*, 143 F.Supp.2d 508, 512 (E.D. Pa. 2001) (quoting *Assicurazioni Generali, S.P.A. v. Clover*, 195 F.3d 161, 164 (3d Cir. 1999))). "If the parties have agreed to the applicable law, that agreed-upon law shall generally be given effect." *Id.*

Here, none of the parties raise the choice-of-law issue in their briefs, and in fact, the parties rely almost exclusively on Pennsylvania law in support of their respective positions. Therefore, the Court finds that the parties have implicitly consented to the application of Pennsylvania law. Based on the parties' implicit agreement that Pennsylvania law applies, there is no reason to sua sponte engage in a choice-of-law analysis. *See Osby v. A & E Television Networks and Kurtis Productions, Ltd.*, 1997 WL 338855, at \*3 (E.D. Pa. Jan.17, 1997) ("Where the parties have agreed to apply Pennsylvania law and Pennsylvania has an interest in the outcome of the litigation, there is no reason for the court, 'sua sponte, to challenge the parties' consensual choice of law'") (quoting *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 269-70 (3d Cir.1980); *Marcone v. Penthouse International, Ltd.*, 533 F.Supp. 353, (E.D. Pa. 1982) (same) (citing *Steaks Unlimited*, 623 F.2d at 269-70), *rev'd by* 754 F.2d 1072 (3d Cir.1985) (providing that "the district court was correct in applying Pennsylvania law")).

2.    Count I – Defamation

At Count I, Peschmann asserts defamation claims against Hagmann and Quayle. To state a claim for defamation under Pennsylvania law, Peschmann must allege: "(1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion." *Hill v. Cosby*, 2016 WL 491728, at \*2 (W.D. Pa. Feb. 9, 2016), *aff'd*, 665 Fed. Appx. 169 (3d Cir.

10

2016) (citing 42 Pa. C.S. § 8343). If the Defendants' statements "impute a criminal offense,

loathsome disease, business misconduct, or serious sexual misconduct, the statement constitutes

defamation *per se* and proof of 'special' damages is not required." *Rose v. Dowd*, 265 F. Supp.

3d 525, 531 (E.D. Pa. 2017) (citing *Franklin Prescriptions, Inc. v. New York Times Co.*, 424 F.3d

336, 343 (3d Cir. 2005)). In a defamation action, the Court must make a threshold determination

whether the challenged statements are capable of defamatory meaning. *Gibney v. Fitzgibbon*,

547 Fed. Appx. 111, 113 (3d Cir. 2013); *see also Byars v. Sch. Dist. of Phila.*, 942 F. Supp.2d

552, 564 (E.D.Pa.2013). "If [they are] not, the claim must be dismissed." *Gibney v. Fitzgibbon*,

2013 WL 1197894, at \*3 (E.D. Pa. Mar. 22, 2013), *aff'd*, 547 Fed. Appx. 111 (3d Cir.2013); *see*

*also Bell v. Mayview State Hosp.*, 853 A.2d 1058, 1061 (Pa. Super. Ct.2004) (affirming the

dismissal of a complaint where plaintiff's factual averments did not establish defamatory

meaning); *Richette v. Phila. Magazine,* 1996 WL 756953, at \*2 (Pa. Ct. Com. Pl. Jan. 23, 1996)

("[A] trial court must first determine whether the offending statement, taken in context, would be

interpreted by a reasonable reader as defamatory. If not, the court should dismiss the action.").

"Whether a statement is capable of a defamatory meaning is a question of law for the

Court." *Byars v. Sch. Dist. of Philadelphia*, 942 F. Supp. 2d 552, 564 (E.D. Pa. 2013) (citing

*Blackwell v. Eskin*, 916 A.2d 1123, 1125 (Pa. Super. Ct. 2007)). "A statement is defamatory 'if

it tends so to harm the reputation of another as to lower him in the estimation of the community

or to deter third persons from associating or dealing with him.'" *Graboff v. Colleran Firm*, 744

F.3d 128, 136 (3d Cir. 2014) (quoting *Thomas Merton Ctr. v. Rockwell Int'l Corp.*, 442 A.2d

213, 281-82 (Pa. 1981)). Although a defendant can avoid defamation liability by showing its

statements were "substantially true," a defendant may be found liable for defamation "where a

statement, viewed in context, creates a false implication." *Id.* (citing *Dunlap v. Phila.*

11

*Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. Super. Ct. 1982). Conversely, "words which standing

alone may reasonably be understood as defamatory may be so explained or qualified by their

context as to make such an interpretation unreasonable." *Mallory v. S&S Publishers*, 168 F.

Supp. 3d 760, 767 (E.D. Pa. 2016) (quoting *Tucker v. Phila. Daily News*, 848 A.2d 113, 124 (Pa.

2004). "It is not enough that the victim of the 'slings and arrows of outrageous fortune,' be

embarrassed, or annoyed, he must have suffered that kind of harm which has grievously

fractured his standing in the community of respectable society." *Scott-Taylor, Inc. v. Stokes*, 229

A.2d 733, 734 (Pa. 1967). Thus, for Peschmann to prevail, "the statement must do more than

merely embarrass or annoy [her]; it must provoke 'the kind of harm which has grievously

fractured [her] standing in the community of respectable society.'" *Graboff v. Colleran Firm*,

744 F.3d 128, 136 (3d Cir. 2014) (quoting *Tucker v. Phila. Daily News*, 848 A.2d 113, 124 (Pa.

2004)).

a.    Alleged Defamatory Statements

Peschmann's Second Amended Complaint alleges that the Defendants defamed her in

two specific formats on February 10, 2015: an online broadcast of the H&H Report, and a "joint

statement" posted on their website. *See* ECF No. 103, at ¶ 125. The Second Amended

Complaint alleges that during their broadcast, Defendant Hagmann stated, in pertinent part:

> The last several months we've been under just a vicious, vile
> attack. It's by two individuals, uh, one Marinka Peschmann, the
> second Michael Erevna . . . Now here's the situation. We both,
> Steve and I have been subject of uh threats, uh intimidation,
> harassment. And I mean harassment . . . We brought our families
> into this. Because our families have been threatened, have been
> directly uh involved in this, to a degree folks that you will never
> know because we will never disclose it. And when Steve says
> death threats, house on the Internet, yes, he's not lying . . . We're
> not going to take any more. We're not going to take any more
> threats to our families. We're not going to take any more threats to

12

> ruin our reputations. We're not going to take the harassment
> anymore.

ECF No. 103, ¶ 136. During that same broadcast, Defendant Quayle stated:

> When I hear a woman making a claim to a national editor of a
> major Internet uh, uh, uh presence, news presence, and talking
> about sleeping with the devil . . . If someone says they are sharing
> the bed with the devil that means they are having sex with an
> entity, okay?

ECF No. 103, ¶ 159. In the "Joint Statement," Peschmann alleges that the Defendants falsely

accused her of engaging in a campaign of slander and libel against them; of accepting financial

support from them; of having been given airtime by them; of benefiting from their solicitation of

support from others; of representing Hagmann "in the press like a press person;" and of claiming

she was angry and agitated because they would not promote one of her books. *See id.* at ¶ 383;

ECF No. 103-2 at 62, 72.

> b.    Hagmann's statements imputing criminal conduct to Peschmann
>       are capable of a defamatory meaning.

Peschmann argues that several statements made by the Defendants constitute defamation

per se because they accuse her of committing crimes, sexual misconduct, and business

misfeasance. *See Baird v. Dun & Bradstreet*, 446 Pa. 266, 274 (1971); *Solosko v. Paxton*, 383

Pa. 419 (Pa. 1956). *See also FJW Investment Inc. v. Luxury Bath of Pittsburgh, Inc.*, 2019 WL

1782190, *3 (Pa. Super. Ct. April 23, 2019) (citing *Walker v. Grant Cent. Sanitation, Inc.*, 634

A.2d 237, 242 (Pa. Super. Ct. 1993). She first points to Hagmann's comments during the online

broadcast which accused her of the crimes of stalking, intimidation and harassment, threatening

their families, making death threats, and murder. ECF No. 103, ¶ 380-81. Such actions are

crimes under Pennsylvania law and statements which impute the commission of a crime are

capable of a defamatory meaning. *See* 18 Pa. C.S.A. § 2709.1(b) (stalking); 18 Pa. C.S.A. §

13

2709(a) (harassment); 18 Pa. C.S.A. §2706 (terroristic threats); and 18 Pa. C.S.A. § 2502, 18 Pa.

C.S.A. § 1102 (murder); *see also Lapinski v. Poling*, 2017 WL 1291496, *6 (Pa. April 7, 2017)

(citing *Marcone v. Penthouse Intern. Magazine for Men*, 754 F.2d 1072, 1078 (3d Cir. 1985),

cert denied, 474 U.S. 1014 (1985)).  Examined in context, these statements can reasonably be

understood to have accused Peschmann of having committed a criminal offense or offenses and

therefore may serve as a basis for a claim of defamation per se against Hagmann.  *See, e.g.,*

*Fogel v. University of the Arts*, 2019 WL 1384577, *11 (E.D. Pa. March 27, 2019).  Because she

has pleaded that Hagmann acted with actual malice, her damages are presumed.[6]  *See Joseph v.*

*Stranton Times, LP*, 192 A.2d 404, 432 (Pa. 2015).   The Defendants' motion to dismiss her

defamation claim based on Hagmann's statements imputing criminal conduct should be denied.

> c.  Quayle's statement regarding Peschmann's sexual activity with the devil is not capable of defamatory meaning.

Next, Peschmann attempts to state a defamation claim against Quayle, arguing that his

comment that she had sexual relations with the devil imputes serious sexual misconduct to her

and therefore constitutes defamation per se.  Courts, for certain, have found false allegations of

serious sexual conduct to be capable of defamatory meaning.  For example, a claim that a college

professor "falsely and maliciously stated to [University] employees and other third parties that

she had been sexually assaulted and harassed by [another professor], when in fact, she had not"

---

[6] The question whether Pennsylvania law permits a plaintiff to recover presumed damages upon a showing of actual malice was unsettled for many years. *See, e.g., Franklin Prescriptions, Inc., v. New York Times*, 424 F.3d 336, 342 (3d Cir. 2005).  In *Joseph v. Scranton Times, L.P.,* 129 A.2d 404, 432 (Pa. 2015), the Pennsylvania Supreme Court resolved the issue, holding that damages will be presumed without proof of harm to reputation if actual malice is shown. Malice "can be proven by demonstrating that the defendant subjectively acted with reckless disregard for the truth [by entertaining] serious doubts as to the truth of his publication." *Castellani v. Scranton Times, L.P.,* 633 Pa. 230, 124 A.3d 1229, 1234 (2015) (quotation marks omitted) (quoting *Weaver v. Lancaster Newspapers, Inc.,* 592 Pa. 458, 926 A.2d 899, 903 (2007)).  Here, Peschmann has met the threshold of pleading actual malice.  She pleads, for example, that "Defendants knew all their statements of facts, innuendos and implications made against Plaintiff were false and were made with actual malice, i.e., with knowledge that the statement(s) were false or with reckless disregard of its falsity and the damage and injury it would do, and is causing the Plaintiff professionally and personally as set forth above." ECF No. 103, ¶ 386.

imputed serious sexual misconduct and stated a claim for defamation per se. *Fogel*, 2019 WL

1384577, *11. A statement that a plaintiff "ran young girls for him down at spring training, ages

12 to 14 . . . so that's statutory rape every time you do that" was capable of a defamatory

meaning. *Rose*, 265 F. Supp. 3d at 533. Likewise, a public statement that a plaintiff was "an

attacker," thereby "forever labeling him in print as a violent sexual deviant" was also found to be

sufficient to state a claim for per se defamation. *Dempsey v. Bucknell University*, 26 F. Supp. 3d

565, 583 (M.D. Pa. Jan. 5, 2015). Asserting to others that a plaintiff had committed "adulterous

sexual conduct," was "a slut," "the queen of sluts," and a "whore" also was found to capable of a

defamatory meaning and, therefore, stated a claim of per se defamation. *Doe v. Simone*, 2013

WL 3772532, *5 (D.N.J. July 17, 2013). Finally, a false claim made to and subsequently

published by a local newspaper that a high school band director had sexually harassed students

stated a claim for defamation because it alleged serious sexual misconduct. *Wagner v.

Tuscarora School Dist.*, 2005 WL 2319141, *5-6 (M.D. Pa. Sept. 21, 2005).

Here, however, Quayle argues, and the Court agrees, that his statement was pure

hyperbole or an epithet, such that it was not provable and thus not defamatory. Statements which

cannot be proven true or false, such as insults and name-calling, even if offensive, are not

capable of a defamatory meaning. And the Constitution actually protects such words. *Milkovich

v. Lorain Journal Co.*, 497 U.S. 1, 17 (1990) (quoting *Greenbelt Cooperative Publishing Assn.,

Inc. v. Bresler*, 398 U.S. 6, 14 (1970)). Similarly protected are those statements which "could

not reasonably have been interpreted as stating actual facts about the" individual, *Hustler

Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988), and statements of opinion unless they imply

"undisclosed defamatory facts justifying the opinion." *Mzamane v. Winfrey*, 693 F. Supp. 2d

442, 477 (E.D. Pa. 2010) (quoting *Remick v. Manfredy*, 238 F.3d 248, 261 (3d Cir. 2001)). *See

*also Purcell v. Ewing*, 560 F. Supp. 2d 337, 342 (M.D. Pa. 2008) (statements that plaintiff looked like "someone accused of child molestation" and that he was a "pervert to look out for" were non-actionable statements of opinion). The Third Circuit has held that "the law of defamation does not extend to mere insult" and that there is "a distinction between actionable defamation and mere obscenities, insults, and other verbal abuse." *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 187 (1999). Here, Peschmann herself acknowledges that Quayle's statement is "impossible to be true," ECF No. 103, at ¶ 83, "preposterous," *Id.* at ¶ 93, "ludicrous," *Id.* at ¶ 94, and "outrageous." *Id.* at ¶ 103. In other words, Peschmann recognizes that this statement was pure hyperbole and not an assertion that a reasonable person could take literally. As such, the statement is not capable of a defamatory meaning. Peschmann's defamation claim against Quayle based upon his "sex with the devil" statement should be dismissed.

> d.    The remaining statements identified in the Second Amended Complaint are not defamatory.

The same is true for the remainder of the alleged defamatory statements identified in Peschmann's Second Amended Complaint. *See* ECF No. 103, ¶ 383(f)-(gg). She charges that the Defendants have defamed her by identifying her as: a nutjob, deluded, a psychopath, a sociopath, mentally retarded, a traitor, a hatchet person, having the spirit of Lucifer, a Satan follower, a false accuser, as guilty of bitterness, envy, strife and "tale-bearing," being incompetent or deliberately untruthful, heinously twisting scripture, claiming she was angry, being a Globalist, a Marxist, and a Communist. ECF No. 103, ¶ 383. She also points to language in their Joint Statement accusing her of accepting financial support from the Defendants, of having been given free airtime by them, of representing Hagmann "in the press like a press person," and of claiming she was angry over their refusal to promote her book. *Id.*; ECF No. 103-2, at 62, 72. None of these statements is defamatory.

16

Questionable rhetoric, name-calling, and hyperbole do not constitute defamation, as numerous reported decisions bear out. *See, e.g., Kryeski v. Schott Glass Technicians. Inc.*, 426 Pa. Super. Ct. 105, 117-18 (1993) (calling a co-worker "crazy"); *Weyrich v. New Republic*, Inc., 235 F.3d 617 (D.C. Cir. 2001) ("paranoia" in its popular, non-clinical sense, is no worse than calling someone "crazy" or "nutty" and is not actionable); *Fram v. Yellow Cab Co. of Pittsburgh*, 380 F. Supp. 1314 (W.D. Pa. 1974) (the words "paranoid" and "schizophrenic" in their popular sense not defamatory). One court has gone so far as to rule non-defamatory a magazine article which referred to a judge as "an emotional wreck," a "horse's ass," and "in a world of confusion." *Duffy Supply Co. v. Crum & Forester Ins. Co.*, 1997 WL 255483, *6 (E.D. Pa. May 8, 1997) (citing *Richette v. Philadelphia Magazine*, 1996 WL 756953, *2 (Phila. Ct. Comm. Pl. 1996)); *see also Smith v. Garber*, 2003 WL 21960720, *1 (E.D. Pa. June 25, 2003). It is certainly understandable that Peschmann would resent being referred to in the terms outlined in her Second Amended Complaint, but such insults are insufficient to support a defamation claim under Pennsylvania law.

In summary, Peschmann's defamation claim against Quayle should be dismissed in its entirety. Her defamation claim against Hagmann should survive dismissal as to his statements imputing criminal conduct to Peschamann. In all other respects, the defamation claim against Hagmann should be dismissed.

3.      Count II – Fraudulent Misrepresentation against Hagmann[7]

At Count II of the Second Amended Complaint, Peschmann asserts a claim of fraudulent misrepresentation against Hagmann. ECF No. 103, ¶¶ 417-434.  Under Pennsylvania law, the elements of fraudulent misrepresentation are: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.[8] *O.D. Anderson, Inc., v. Empaco Equipment Corp.*, 2019 WL 1395606, *4 (W.D. Pa. March 20, 2019) (citing *Weston v. Northampton Personal Care, Inc.*, 62 A.3d 947, 960 (Pa. Super. Ct. 2013) (citations omitted)).  Fraudulent misrepresentation claims under Pennsylvania law must be pled with particularity under Rule 9(b).  *Petruska v. Gannon Univ.*, 462 F.3d 294, 310 (3d Cir. 2006).  Peschmann claims that Hagmann gave her information he knew to be false––that he was being targeted by the NSA––and that she relied to her detriment on that information in publishing a story in the *Canada Free Press*.  ECF No. 103, ¶ 418.  This allegation fails to state a claim for fraudulent misrepresentation.

The Court notes at the outset that Peschmann has not specifically alleged that Hagmann made the alleged misrepresentation about NSA surveillance to her directly.  She instead pleads that it was information given to her by her editor, Judi McLeod, which spurred her to write her article—not any statement made directly to her by Hagmann.  Indeed, many of the allegations of

---

[7] Peschmann's claim presents the novel issue of whether a journalist who publishes a factually inaccurate article in reliance upon false information provided by a source can have a misrepresentation cause of action against that source.  Given the elemental defects in Peschmann's claim discussed below, however, the Court need not reach that issue.

[8] This tort is sometimes referred to as "intentional misrepresentation."  *See, e.g., Schnell v. Bank of New York Mellon*, 828 F. Supp. 2d 798, 804-05 (E.D. Pa. 2011).

18

Peschmann's Second Amended Complaint fault McLeod.[9] In and of itself, this poses no barrier

to her claim because Pennsylvania law does not require that the misrepresentation be made

directly to the individual asserting the claim. *Woodward v. Dietrich*, 378 Pa. Super. Ct. 111, 127

(1988). Instead, "when the misrepresentation is fraudulent rather than negligent, the scope of

liability is expanded to include not only those intended to rely on the deceit but also those whom

the party making the misrepresentation has special reason to expect may reasonably rely on the

misrepresentation ...." *Id.* at 127-128 (quotations and emphasis omitted). So while the Second

Amended Complaint identifies McLeod as actually making the misrepresentation which spurred

Peschmann to write her article, she also pleads that McLeod "claimed that Hagmann . . . had

specifically requested that she report [his] NSA targeting allegation because of the type of

reporting she has done." ECF No. 103, ¶ 35.

There are at least two fundamental problems, however, with Peschmann's fraudulent

misrepresentation claim.[10] First, Peschmann has failed to allege damages, with particularity,

---

[9] For example, Peschmann states that McLeod "forwarded email exchanges she had with Hagmann to the Plaintiff for her to report Hagmann's serious allegations against a U.S. government agency." *Id.* at ¶ 34. Further, McLeod "vouched for Hagmann . . . and assigned the story to the Plaintiff." *Id.* at ¶ 35. Peschmann states that "McLeod requested that the story be reported the following morning," and that she has never "seen Hagmann's sworn affidavit he claimed he had sworn under penalty of perjury, only the unsworn versions she had received by email from Judi McLeod and Hagmann when she was assigned to the story." *Id.* at ¶¶ 43, 76. Peschmann was "livid" that McLeod "asked her to report a serious allegation from Hagmann who she did not trust." *Id.*, ¶ 85. Peschmann pleads, quite expressly, that she was assigned to write an article about the National Security Agency's alleged interest in Defendant Hagmann by Judi McLeod and that she was justified in relying on McLeod's representations about Hagmann in doing so. It was McLeod whom the Complaint identifies as the person making the misrepresentation to Peschmann about the NSA's purported investigation of Hagmann. *See, e.g., id.* at ¶ 22 ("McLeod told the Plaintiff that Hagmann, one of her long time [sic] senior columnists, had been targeted by the National Security Agency (NSA);" ¶ 35 ("McLeod vouched for Hagmann . . . and like other editors do, she assigned the story to Plaintiff.").

[10] Peschmann does state that the evening McLeod assigned her to write an article about Hagmann and the NSA, she spoke with Hagmann on the telephone and that he recounted his allegation about NSA surveillance to her. ECF No. 103, ¶ 36. But this was after McLeod made the initial misrepresentation upon which she relied to write her article. Further, the Second Amended Complaint does not aver that it was her conversation with Hagmann that prompted her to write the article; nor could it have as she had already accepted the assignment from McLeod when she spoke with Hagmann. *See, e.g., Mahakali Krupa, LLC v. Allstate Ins. Co.*, 619 Fed. Appx. 98, 104 (3d Cir. 2015) ("They, however, did not speak with Purcell until August 26, 2011. They thus could not have been relying on her statement at the time they purchased the franchise.").

from Hagmann's alleged misrepresentation.  "A plaintiff in federal court must also comply with Rule 9(b) of the Federal Rules of Civil Procedure and therefore must allege "'the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation' and must state 'the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged.'" *Norfolk Southern Railway Company v. Pittsburgh & West Virginia Railroad*, 870 F.3d 244, 255-56 (3d Cir. 2017) (internal quotation marks and citations omitted) (quoting *Federico v. Home Depot,* 507 F.3d 188, 200 (3d Cir. 2007) (emphasis added).  The Second Amended Complaint states only that "Plaintiff relied on Hagmann's misrepresentations, acted upon them in good faith, and has been damaged as a result." *Id.* at ¶ 419.  Further, she alleges that if she "knew then what she knows now, she never would have reported their false NSA targeting allegation to find their government agency sources or filed FOIAs and has had a definite change of position." *Id.* at ¶ 420.  Peschmann's regrets upon learning the truth, while understandable, do not constitute damages for purposes of a fraudulent misrepresentation claim.

Despite its length, the Second Amended Complaint does not identify how Peschmann has been damaged by Hagmann's misrepresentation.  She states only that she "has been damaged as set forth above in SAC [Second Amended Complaint] which is incorporated herein by reference in its entirety." *Id.* at ¶ 433.  But nowhere does she allege with specificity the nature of her damages as required by Pennsylvania law. *Mellon Bank*, 951 F.2d at 1409.  She does not allege, for example, any actual financial harm she experienced as a result of Hagmann's alleged misrepresentation. *See, e.g., Rosen v. Communication Servs. Grp. Inc*., 155 F. Supp. 2d 310, 322 (E.D. Pa. 2001).  Nor does she allege loss of business opportunities, cancellation of contracts, or specific reputational injury. *See, e.g., Metcalf v. Lynch*, 2013 WL 11409703, *2 (M.D. Pa. Jan.

9, 2013). To the contrary, she merely speculates as to possible lost opportunities. *See* ECF No.
103, ¶ 182. And Peschmann herself acknowledges that she "has since corrected her inaccurate
reporting and shown Defendants' government and financial sources do not have the claimed
bona fides, apologized publicly, and has a prejudicial change in her opinion." ECF No. 103, ¶
426. Where a plaintiff has failed to allege some specific pecuniary loss, a claim for fraudulent
misrepresentation should be dismissed. *See, e.g., Saferstein v. Paul, Mardinly, Durham, James,
Flandreau & Rodger, P.C.*, 1997 WL 102521, *6 (E.D. Pa. Feb. 28, 1997).

Second, while Peschmann has alleged generally that statements made by Hagmann were
false, she has also not alleged specifically that Hagmann's statement regarding NSA surveillance
was false. *See, e.g., Sysco Food Servs. of Metro New York, LLC v. Tramontana*, 2007 WL
4165349, *3 (D.N.J. Nov. 20, 2007) (fraudulent misrepresentation claim dismissed where
plaintiff failed to plead that the alleged misrepresentations were actually false). This Court has
explained that, "[a]t bottom, it is well-established that '[f]raud consists of anything calculated to
deceive, whether by single act or combination, or by suppression of truth, or suggestion of what
is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth,
or look or gesture.'" *Daimler v. Moehle*, 2019 WL 2422843, *5 (W.D. Pa. June 10, 2019)
(citation omitted) (quoting *Delahanty v. First Pennsylvania Bank N.A.*, 464 A.2d 1243, 1252 (Pa.
Super. Ct. 1983)). But here, Peschmann merely questions the credibility of Hagmann's
statement based on the following:

- Peschmann was "troubled" by Quayle's use of her article as a fundraising
  vehicle for Hagmann. ECF No. 103, ¶ 50;
- Hagmann published his own article on his website warning of an imminent
  Obama Administration "crack down on the media," which was based on

21

Hagmann's discussions with Department of Homeland Security "Insider." *Id.*
¶ 54.

- Hagmann claimed that this Insider was risking his life to relay this information and that he had received threats that his wife and daughter are "going to be raped and killed while he watched." *Id.* ¶ 57.

- Hagmann claimed this same Insider told him on June 9, 2013, that the Obama Administration, within thirty days, was going to implement martial law, that there would be "blood in the streets," and that American people would be "shot and killed." *Id.* ¶ 58.

- On June 14, 2013, Quayle published an article on his website stating that Hagmann's life was in danger—claiming Hagmann was almost killed by a "goon squad." *Id.* ¶ 60

The Second Amended Complaint also relates an array of comments by Hagmann during his broadcasts that portray him as paranoid and self-important and upon which she questioned the credibility of his statements generally. Peschmann alleges, for example, that after Hagmann claimed that he was in "imminent physical danger," and "in the struggle of his life," she was "horrified, concerned, and questioned the veracity of Hagmann's allegations and sources." *Id.* ¶ 74. She also relates that McLeod, the Canadian Free Press editor, communicated her concern to Peschmann about the veracity of Hagmann's statements. *Id.* ¶ 77. According to Peschmann, McLeod contended that Hagmann had previously "made news up," referencing Hagmann's appearance as an expert guest on Alex Jones's Infowars.com. *Id.* ¶ 84. In this respect, Peschmann's pleading seems intent on exposing Hagmann as a conspiracy theorist who regularly makes-up news in an effort to sow discontent, fear and paranoia among the public and to exploit

22

the impressionability of his likeminded listeners. *See, e.g., id.* ¶ 89.  Absent from the Second

Amended Complaint, however, are allegations that Hagmann represented that he was the subject

of NSA surveillance, knowing that he was not, and that he did so with the intent to induce

Peschmann's reliance upon his misrepresentation.

As an alternative to pleading specific facts of Hagmann's misrepresentation, Peschmann

may yet state a claim if she alleges specific facts that lead to the inference of fraudulent intent.

*See Clientron Corp. v. Bennett*, 2014 WL 2693583, *3 (E.D. Pa. June 12, 2014) (citing *HCB*

*Contractors v. Rouse & Assoc., Inc.*, 1992 WL 176142, *5 (E.D. Pa. July 13, 1992) (dismissing

plaintiff's fraud count because it had only alleged a "bald allegation of dishonesty

unaccompanied by any specific facts from which even an inference of fraud can be drawn").  But

nothing pleaded herein leads to an inference that Hagmann intended to misrepresent himself to

Peschmann regarding the alleged NSA surveillance.  For example, Hagmann's history of making

claims regarding an Obama Administration "crack down on the media" and an impending

imposition of martial law by that Administration do not logically lead to an inference that

Hagmann intended to deceive Peschmann about NSA surveillance.  Nor can any inference be

drawn from Quayle's 2013 statement that Hagmann was almost killed by a "goon squad" as that

statement is unrelated to Hagmann's assertion of NSA surveillance in 2015.  What Peschmann

has related is a history of seemingly wild accusations and allegations made by both named

Defendants.  But she has not alleged facts to connect such statements to the NSA surveillance

statements made by Hagmann in 2015.[11]  Accordingly, Peschmann's claim for fraudulent

---

[11] Among the type of factual allegations that the Third Circuit has suggested might be probative of fraudulent intent include the "utter recklessness and implausibility of the statement in light of subsequent acts and events." *Luscko v. S. Container Corp.*, 408 Fed. Appx. 631, 634-35 (3d Cir. 2010).  Peschmann, however, has not alleged any subsequent acts or events on Hagmann's part which would infer recklessness or implausibility of his statement.  She only alleges that after the publication of her article, Hagmann asked her to cease her FOIA activities on his behalf. *See* ECF No. 103, ¶90.  The Court does not find this to be a subsequent act or event in light of his previous

misrepresentation should be dismissed. That dismissal, however, should be without prejudice, and with Peschmann granted leave to amend to correct the identified deficiency of this claim, if possible.

4. Count III – Negligent Misrepresentation against Hagmann and Quayle

At Count III, Peschmann alleges a claim of negligent misrepresentation against Hagmann and Quayle. *See* ECF No. 103, ¶¶ 435-446. This claim should also be dismissed.

With regard to negligent misrepresentation, Pennsylvania has adopted the Restatement (Second) of Torts § 552 which provides that:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*See Mill-Mar, Inc. v. Statham*, 420 A.2d 548, 550 (Pa. Super. Ct. 1980), *appeal dismissed*, 452 A.2d 1017 (Pa. 1982) (adopting Restatement (Second) of Torts § 552)); *see also Saferstein*, 1997 WL 102521, *6. "Thus, negligent misrepresentation differs from intentional misrepresentation in that to commit the former, the speaker need not know his or her words are untrue, but must have failed to make reasonable investigation of the truth of those words." *Gibbs v. Ernst*, 538 Pa. 193, 210, 647 A.2d 882, 890 (1994) (citing Restatement (Second) of Torts § 552). Like any action in negligence, however, there must be an existence of a duty owed by one party to another." *Weisblatt v. Minn. Mut. Life Ins. Co.*, 4 F. Supp. 2d 371, 380 & n.9 (E.D. Pa. 1998) (noting the difference between fraudulent and negligent misrepresentation is largely one of

---

statement. As Defendant Hagmann points out, in and of itself, the fact that he "rescinded his FOIA authorization" does not contradict his claim of NSA surveillance.

scienter). So then, "[u]nder Pennsylvania law, a plaintiff alleging negligent misrepresentation must establish: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *M.B. v. Schuylkill*, 375 F. Supp.3d 574, 601-02 (E.D. Pa. 2019) (citing *Bilt–Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 866 A.2d 270, 277 (2005) (other citation omitted).

First, Peschmann has not identified any statement by Quayle that she alleges was false and upon which she allegedly relied to her detriment. Rather, her claims of misrepresentation, both fraudulent and negligent, are based primarily on statements made by Hagmann.[12] Accordingly, her claim against Quayle should be dismissed.

Next, Peschmann has also failed to state a claim of negligent misrepresentation against Hagmann because the Second Amended Complaint does not identify a misrepresentation that Hagmann should have known to be false and upon which she relied and suffered damages as a consequence. While damages are presumed for purposes of her defamation per se claim, this is not the case for her misrepresentation claims, each of which requires allegations of actual loss or injury as a necessary element. Accordingly, her negligent misrepresentation claim against Hagmann also should be dismissed. That dismissal, however, should be without prejudice, and with Peschmann granted leave to amend to correct the identified deficiency of this claim, if possible.

---

[12] The Second Amended Complaint does note a statement Quayle made on November 19, 2014 in which he called Peschmann one of "hell's messengers." ECF No. 103, ¶ 117. This epithet, however, was not a statement of fact upon which Peschmann somehow relied. It was a statement made after Peschmann published a "follow-up" article retracting her prior writing about the NSA's alleged surveillance of Hagmann. Thus, it could not have induced Peschmann to write the article and cannot be a basis for a negligent misrepresentation claim.

5.      Count IV – Intentional and Negligent Infliction of Emotional Distress

Next, Peschmann brings claims of intentional and negligent infliction of emotional

distress against both Defendants. *Id.* at ¶¶ 447-473.  To state a claim for intentional infliction of

emotion distress under Pennsylvania law, the plaintiff must allege facts supporting that: (1)

defendant's conduct was intentional or reckless, (2) the conduct was extreme and outrageous, (3)

it caused emotional distress, and (4) the emotional distress was severe. *Frankel v. Warwick*

*Hotel*, 881 F. Supp. 183, 187 (E.D. Pa. 1995) (citation omitted).

In evaluating the sufficiency of Peschmann's intentional infliction of emotion distress

claim, the Court should, as a threshold inquiry, determine whether the defendant's alleged

conduct may reasonably be regarded as satisfying the "extreme and outrageous" element of this

cause of action. *McGee v. Conyngham Twp.*, 2018 WL 2045437, at *8 (M.D. Pa. May 1, 2018)

("it is for the court to determine in the first instance whether the defendant's conduct may

reasonably be regarded as so extreme and outrageous to permit recovery.") (citing *Johnson v.*

*Caparelli*, 404, 625 A.2d 668, 671 (Pa. Super. Ct. 1993); *Snyder v. Specialty Glass Products,*

*Inc.*, 658 A.2d 366 (Pa. Super. Ct. 1995); *Ruder v. Pequea Valley Sch. Dist.*, 790 F.Supp.2d 377,

398 (E.D. Pa. 2011).  According to comment d of 46 of the Restatement (Second) of Torts

(1965), which the Court of Appeals has found to be an accurate statement of Pennsylvania law,

liability has been rejected even where "the defendant has acted with an intent which is tortious or

even criminal, or that he has intended to inflict emotional distress, or even that his conduct has

been characterized by 'malice.'" *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265,

1274 (3d Cir. 1979) (quoting Restatement (Second) of Torts, § 46, comment d).  Rather,

"[l]iability has been found only where the conduct has been so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community." *Id.*; *Ruder v. Pequea Valley Sch. Dist.*, 790 F. Supp. 2d 377, 397 (E.D. Pa. 2011).

In the present case, most of the twenty-six paragraphs Peschmann devotes to her emotional distress claims are little more than broad characterizations that the Defendants' conduct was "atrocious," "outrageous," "extreme," and "beyond all possible bounds of decency." ECF No. 103, ¶¶ 448, 452. She also faults the Defendants for not adhering "to the basic principle of 'Thou shall not bear false witnesses,'" *Id.* at ¶ 454, and for "weaponizing the Internet," causing her to "cringe when she goes online." *Id.* at ¶ 456. She claims that Hagmann has been "gas lighting" her.[13] *Id.* at ¶ 460. Finally, she claims the Defendants' actions potentially exposed her to criminal liability.[14] *Id.* at ¶ 467. Stripped of adjectives and characterizations, however, the factual basis for Peschmann's claim distills down to two areas: Hagmann providing her with information that she later suspected to be false, specifically that he was under NSA surveillance, and statements by Hagmann and Quayle in response to her retractions of her article. This conduct is insufficient to support a claim for intentional infliction of emotional distress. See *Hunger v. Grand Cent. Sanitation*, 670 A.2d 173, 177 (Pa. Super. Ct. 1996) ("liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."); *Snyder*, 658 A.2d at 375 (plaintiff employee's suffering verbal abuse and demotion after arriving late to work was not outrageous as a matter of law); *Ruder*, 790 F.Supp.2d at 398 (motion to dismiss granted because defendant's failure to provide

---

[13] Peschmann does not define this term. The Court will assume its ordinary meaning, "the manipulation of someone by psychological means into questioning their own sanity." *See, e.g., Tantaros v. Fox News Network, LLC*, 2018 WL 2731268, *5 n.9 (S.D.N.Y. May 18, 2018).

[14] Peschmann does not allege that Defendants reported her to any law enforcement authorities or otherwise caused her to come under the scrutiny of such authorities.

the plaintiff with medical leave and benefits, and its subsequent termination of the plaintiff, was not outrageous as a matter of law). Accordingly, this claim should be dismissed.

To state a claim for negligent infliction of emotional distress, a plaintiff must establish the elements of a negligence claim and "at least one of the following four elements: (1) that the defendant had a contractual or fiduciary duty toward him; (2) that Plaintiff suffered a physical impact; (3) that Plaintiff was in a 'zone of danger' and at risk of an immediate physical injury; or (4) that Plaintiff had a contemporaneous perception of tortious injury to a close relative." *Wilder v. United States*, 230 F. Supp. 2d 648, 653–54 (E.D. Pa. 2002) (citing *Doe v. Phila. Cty. Health Alts.*, 745 A.2d 25, 27 (Pa. Super. Ct. 2000)). The facts alleged in the Second Amended Complaint do not support the existence of a contractual or fiduciary duty owed by either named Defendant toward Peschmann. Likewise, Peschmann has not alleged that she suffered immediate and substantial physical harm from being in a zone of danger or viewing a traumatic incident. Accordingly, her negligent infliction of emotional distress claim should also be dismissed.

6.    Count V – Equitable Estoppel against Quayle and Hagmann

At Count V, Peschmann alleges a claim for "equitable estoppel." ECF No. 103, ¶¶ 474-479. This claim should be dismissed outright. Under Pennsylvania law, equitable estoppel is not a separate cause of action. *See Carlson v. Arnot-Ogden Memorial Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990) (citing *Paul v. Landenau Hosp.*, 543 A.2d 1148 (Pa. Super. Ct. 1988)). *See also Liebman v. Prudential Financial, Inc.*, 2002 WL 31928443, *3 (E.D. Pa. Dec. 30, 2002); *Graham v. Pennsylvania State Police*, 643 A.2d 849, 852 (Pa. Commw. Ct. 1993) ("[E]quitable estoppel . . . has only been recognized as a defense and not a cause of action in itself."). Instead

28

the doctrine may be raised either as an affirmative defense or as grounds to prevent a defendant from raising a particular defense. *Paul*, 543 A.2d at 1152.

       7.    Count VI – Civil Conspiracy against all Defendants

At Count VI, Peschmann asserts a claim for civil conspiracy against Quayle and Hagmann, as well as the several unnamed John Doe Defendants. *See* ECF No. 103, ¶¶ 480-493. To state a claim for civil conspiracy under Pennsylvania law, a plaintiff must allege: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by means of an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 660 (Pa. Super. Ct. 2000) (citing *McGuire v. Shubert*, 722 A.2d 1087, 1092 (Pa. Super. Ct. 1998)). More specifically, "the plaintiff must expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred." *Flanagan v. Shively*, 783 F. Supp. 922, 928 (M.D. Pa. 1992). The conspiracy claim may proceed only if the plaintiff alleges facts to support "all elements necessary to such a cause of action." *Lackner v. Glosser*, 892 A.2d 21, 34 (2006) (quoting *Rutherford v. Presbyterian-Univ. Hosp.*, 612 A.3d 500, 508 (Pa. Super. Ct. 1992)). *See also McGary v. Williamsport Reg'l Med. Ctr.*, 2019 WL 2395127, *6 (3d Cir. June 6, 2019) (citing *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (1979)).

Applying these principles to Peschmann's conspiracy claim is hampered by the imprecise and conclusory nature of her allegations. Broadly, Peschmann alleges that Quayle and Hagmann "either directly, in concert with, or through agents, proxies, and/or individuals in their Circle of Trust, John Does 1-20, each committed the torts of civil conspiracy to harm the Plaintiff." ECF No. 103, ¶ 481. Rather than alleging specific concerted action or an agreement by two or more

29

defendants to perform an unlawful act, or a lawful act by some unlawful means, Peschmann

globally critiques the Defendants and their associates and followers as propogandists whose

practices harm legitimate journalism and journalists and society in general.  For example, she

alleges that

> Defendants, knowingly collaborated, assisted one another, and
> engaged in, and used other purported truth telling 'Christian'
> individuals, in their alternative media Circle of Trust ... as false
> witnesses against the Plaintiff and others, while attempting to
> manipulate U.S. legal systems, and silence journalists from doing
> what journalists do—expose corruption and correct false
> allegations, thereby hampering government efforts, engaging in
> propaganda[,] publishing and disseminating false information, and
> otherwise who provide material support in furtherance of the
> conspiracy.

*Id.* at ¶ 487.  She focuses her attack primarily upon the Defendants' conduct after Hagmann

indirectly provided the information concerning the doubtful NSA surveillance claim.  In support

of the alleged conspiracy, for example, she alleges that the Defendants "had weeks, months

and/or years to simply retract the false NSA targeting allegation, and come clean regarding their

fraudulent sources, apologize; and stop this tortious conduct, instead they dug in, continued and

escalated their unlawful conduct, causing the Plaintiff compounding damage, and by continuing

to harm more innocent individuals, separate from the Plaintiff."  *Id.* at ¶ 483.

Peschmann's other vague and conclusory allegations likewise do not save her conspiracy

claim.  She alleges, for example, that the Defendants acted "maliciously with the intent of

injuring" her, but provides no specific examples of how they did that.  *See* ECF No. 103, ¶ 482.

Further, her Second Amended Complaint alleges that the Defendants "took continuing overt acts

in furtherance of their unlawful and unethical common purpose" but does not state what those

over acts were.  *Id.* at ¶ 484.  She claims that the Defendants "concealed from her their written

and or oral agreements between themselves and Does 1-20 in their Circle of Trust."  *Id.* at ¶ 490.

30

But she does not identify the nature, object or substance of these vaguely described "written and or oral agreements."

Furthermore, "actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor." *Levin v. Upper Makefield Twp., Bucks Cnty., Pa.,* 90 Fed. Appx. 653, 667 (3d Cir. 2004) (citations omitted). "Ultimately, only a finding that the underlying tort has occurred will support a claim for civil conspiracy." *Reese v. Pook & Pook*, LLC., 158 F. Supp.3d 271, 292 (E.D. Pa. 2016) (internal quotations omitted). Peschmann continues to point to the suspect information Hagmann gave her regarding NSA surveillance and her subsequent authorship of an article on that topic. The fact that Hagmann may have lied to her about NSA surveillance alone is not an "independent wrong or tort" on which a civil conspiracy claim may be based. As discussed above, the Second Amended Complaint fails to state a claim for intentional or negligent misrepresentation, which negates any reliance upon those torts in support of her conspiracy claim. Finally, the Second Amended Complaint includes no allegations that Hagmann conspired with any other person to defame Peschmann by making statements imputing criminal conduct to her. Therefore, Peschmann's conspiracy claim should be dismissed.

        8.     Count VII – Aiding and Abetting against all Defendants

At Count VII, Peschmann asserts a claim for aiding and abetting against all of the Defendants. Pennsylvania recognizes the tort of aiding and abetting as stated in § 876 of the Restatement (Second) of Torts, Persons Acting in Concert. *Austin v. Hill*, 2014 WL 1386338, *13 (E.D. Pa. April 9, 2014) (citing *Skipworth by Williams v. Lead Indust. Assoc. Inc.*, 690 A.2d 169 (Pa. 1997). Section 876 provides that a person is subject to liability for harm to a third person arising from the tortious conduct of another if he:

31

>    a) does a tortious act in concert with the other or pursuant to a
>    common design with him, or
>
>    b) knows that the other's conduct constitutes a breach of duty and
>    gives substantial assistance or encouragement to the other so as to
>    conduct himself, or
>
>    c) gives substantial assistance to the other in accomplishing a
>    tortious result and his own conduct, separately considered,
>    constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (1979). Therefore, "liability for aiding and abetting

requires proof of three elements: underlying tortious conduct, knowledge, and substantial

assistance." *Jenkins v. Williams*, 2008 WL 1987268, \*14 (D. Del. May 7, 2008). Importantly,

"with regard to this second element, mere knowledge is insufficient. The knowledge element

must be coupled with some degree of intent. Additionally, there must be a linkage of knowledge

to the third element of liability, that is, providing substantial assistance." *Id*. at 14. Finally, the

plaintiff must establish the completion of the underlying tort in order to establish a prima facie

case for a claim of aiding and abetting that tort. *Daniel Boone Area Sch. Dist. v. Lehman Bros.,*

*Inc*., 187 F.Supp.2d 400, 412 (W.D. Pa. 2002) ("The plain language of § 876(a) indicates that a

concert of action claim will lie only if both persons who are alleged to have acted in concert each

committed a tortious act."). Peschmann's allegations fail to support the foregoing elements.

Accordingly, this claim should also be dismissed.

Peschmann alleges that Quayle and Hagmann "aided and abetted one another, Does 1-20

as false witnesses to each other's false allegations, by exploiting and harming the Plaintiff."

ECF 103, ¶ 495. Like her conspiracy claim, this claim reads more like a critique of the

Defendants' media and journalistic practices and the harm those practices impose on society than

as concise and direct allegations of fact to support the elements of her claim. Peschmann states

that Quayle and "his Renaissance Precious Metals is akin to a rainmaker," that he is the sponsor

of "purported Christian media personalities," and "through payments, conference appearances, other types of remuneration, or other means, compelled and induced one another to play along and be complicit." *Id.* at ¶ 497. She alleges that the Defendants "either directly or through agents, proxies, and individuals in their Circle of Trust, assisted these individuals in pursuing, and additionally publish, or cause to be published defamatory and harmful statements about the Plaintiff through saying such outlandish things about her by making false statements of fact claiming she is part of some cabal, and/or part of some Communist Marxist takeover of America, or something, or that this Action is an attempt to 'censor them' on each other's radio shows to keep their trusting audiences paranoid, frightened, sending in donations and buying their wares." *Id.* at ¶ 498.

Giving Peschmann's allegations the most generous interpretation and all benefit of doubt, the Court construes the tortious act upon which she is basing her aiding and abetting claim as Hagmann's statements imputing criminal conduct to her. As discussed earlier, Peschmann's allegations regarding these statements are sufficient to state a claim for defamation. Therefore, the Court should also construe Peschmann's Second Amended Complaint as attempting to assert a claim of aiding and abetting defamation and find that she has sufficiently pled the completion of the underlying tort. ECF No. 103, ¶ 498. Peschmann's aiding and abetting claim nevertheless fails because she has not alleged any facts to show that any Defendant provided substantial assistance or encouragement to Hagmann with respect to his statements imputing criminal conduct to her. The Second Amended Complaint does not allege that Quayle or any Doe Defendant encouraged Hagmann to make these particular statements or affirmatively joined in them. At best, the allegations of the Second Amended Complaint assert that Quayle and others within the "Circle of Trust" support Hagmann's media tactics and therefore should be liable for

any defamatory statement he may utter.  Pennsylvania law does not recognize such a result.  As Peschmann's allegations fail to support necessary elements of her aiding and abetting claim, this claim should be dismissed.

9.      Count VIII – Unjust Enrichment against all Defendants

At Count VIII, Peschmann alleges a claim of unjust enrichment against the Defendants. She claims that Quayle, Hagmann, and the John Doe Defendants have "verbal and or written agreements, as part of their shared motivation to defame and irreparably harm the Plaintiff to escape liability which was and remains deliberately concealed from her when she would not be complicit, look the other way, or join them when Defendants' intentionally, and maliciously mislead and exploited the Plaintiff, as a journalist, into reporting a false allegation against the NSA . . ." ECF No. 103, ¶ 503.  She alleges that she has "conferred a substantial benefit upon the Defendants" and that the Defendants "retained the benefit." *Id.* at ¶¶ 504-05.   The Defendants, according to the Second Amended Complaint, "wrongfully secured and passively received benefits that it would be unconscionable for them to retain, by way of fundraising, advertising dollars, sales of precious metals and doomsday gear, books, DVDs and other wares off of making false allegations, and by misleading, exploiting the Plaintiff, and by their attacks on her when she would not play along, or look the other way in furtherance of their tortious conduct." *Id.* at ¶ 509.

Under Pennsylvania law, unjust enrichment claims fall into one of two categories: (1) a quasi-contract theory of liability, in which case the unjust enrichment claim is brought as an alternative to a breach of contract claim; or (2) a theory based on unlawful or improper conduct established by an underlying claim, such as fraud, in which case the unjust enrichment claim is a companion to the underlying claim. *Dockery v. Heretick*, 2019 WL 2122988, *21 (E.D. Pa. May

34

14, 2019) (citing *Zafarana v. Pfizer, Inc.*, 724 F. Supp. 2d 545, 561 (E.D. Pa. 2010) (dismissing the plaintiff's unjust enrichment claim because (1) the plaintiff did not allege that the defendant refused to provide a service or good after securing a benefit, and (2) the plaintiff did not "plead a separate tort, the damages from which could be supported by a theory of unjust enrichment"). *See also Torchia v. Torchia*, 499 A.2d 581, 583 (Pa. Super. Ct. 1985) ("To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain." (internal quotation marks and citation omitted)). Under either theory, the requisite circumstances do not exist to establish that the defendant has been "unjustly enriched."

As to the first theory, an unjust enrichment claim based on a theory of quasi-contract may be pleaded as an alternative to a breach of contract claim. *Lugo v. Farmers Pride, Inc.*, 967 A.2d 963, 970 (Pa. Super. Ct. 2009). A quasi-contract theory is "typically invoked ... when [the] plaintiff seeks to recover from [the] defendant for a benefit conferred under an unconsummated or void contract." *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 936 (3d Cir. 1999). Peschmann has not alleged any contract—either oral or written—between herself and the Defendants. Thus, this theory of recovery, therefore, is not available to her.

As concerns the second theory, an unjust enrichment claim may be pleaded "as a companion, but not an alternative, to a claim of unlawful or improper conduct as defined by law—e.g., a tort claim." *Dockery*, 2019 WL 2122988, *21. "In the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched)." *Steamfitters*, 171 F.3d at 936. Thus, where a claim for unjust enrichment is based on the same improper

35

conduct as the underlying tort claim, the unjust enrichment claim will rise or fall with the underlying claim. *See, e.g., id.* at 937 (dismissing the plaintiff's unjust enrichment claim because it was based on the same improper conduct as the plaintiff's traditional tort claims, which were dismissed for lack of proximate cause). Put another way, an unjust enrichment claim based on wrongful conduct cannot stand alone as a substitute for the failed tort claim. *Zafarana*, 724 F. Supp. 2d at 561; *see also In re Avandia Mktg., Sales, Practices & Prods. Liab. Litig.*, 2013 WL 3486907, at *3 (E.D. Pa. July 10, 2013); *Tatum v. Takeda Pharm. N. Am., Inc.*, 2012 WL 5182895, at *4 (E.D. Pa. Oct. 19, 2012).

Under Pennsylvania law, "the heart of a claim for unjust enrichment is that 'the party against whom recovery is sought either wrongfully secured or passively received a benefit that would be unconscionable for the party to retain without compensating the provider.'" *Schmidt v. Ford Motor Co.*, 972 F. Supp. 2d 712, 721 (E.D. Pa. 2013) (citing *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir.1987). Importantly, "[t]he 'benefit' must be conferred by the plaintiff directly—*indirect benefits bestowed by third parties will not support a claim for unjust enrichment*." *Maxwell v. Adapt Appalachia, LLC*, 2015 WL 1444388, at *7 (W.D. Pa. Mar. 30, 2015) (emphasis supplied); *Schmidt*, 972 F. Supp. 2d at 721-22 (citing *Bridgestone/Firestone, Inc. v. Carr's Tire Serv., Inc.*, 1992 WL 365512, at *16 (E.D. Pa. Nov. 30, 1992); *Samuels v. Hendricks*, 445 A.2d 1273, 1276 (Pa. Super. Ct. 1982) ("[T]he mere fact that [defendant] may have indirectly benefited from [plaintiff's] performance is not sufficient to impose upon her a duty to make restitution.").

Here, Peschmann initially based her claim for unjust enrichment on her defamation, misrepresentation and other tort claims. Because only the defamation per se claim against Hagmann is sufficiently alleged, however, her unjust enrichment claim can survive only if the

36

facts alleged in the Second Amended Complaint establish that Hagmann "either wrongfully secured or passively received a benefit" as a result of his defamatory statements, and that it "would be unconscionable for [Hagmann] to retain [the benefit] without compensating the provider," Peschmann. *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987) (citing *Torchia v. Torchia*, 499 A.2d 581 (1985)). The Second Amended Complaint supports no such conclusion. Peschmann has alleged no facts to show that she provided a benefit to Hagmann relative to his alleged defamation. While Peschmann is presumed to have suffered damages as a result of Hagmann's alleged defamation in this case, such damages are not the equivalent of a "benefit conferred" for purposes of unjust enrichment. "The essence of unjust enrichment is that one party has received money or a benefit at the expense of another which, in good conscience, ought to be returned." *Pauza v. The Standard Grp., Inc.*, 2008 WL 5451012, at *5 (D.N.J. Dec. 31, 2008) (applying New York law) (quoting *Carriafielio–Diehl & Associates, Inc. v. D & M Elec. Contracting, Inc.*, 12 A.D.3d 478, 784 N.Y.S.2d 617, 618 (2d Dep't 2004). In the present case, there is no "benefit" to be returned, and relative to Peschmann's defamation claim, it is the damages presumably suffered by Peschmann that are compensable, not any benefit conferred upon Hagmann.

Further, even if Peschmann's other tort claims had survived Defendants' Motions to Dismiss, their pendency would not have saved her unjust enrichment claim. Peschmann appears to assert that Hagmann and Quayle benefited unjustly by using her NSA surveillance article and her retractions of that article for fundraising and marketing purposes—i.e., to induce third parties to send money to Hagmann and Quayle. Specifically, she alleges that both Defendants benefitted from her authorship of the NSA surveillance article "by way of fundraising, advertising dollars, sales of precious metals and doomsday gear, books, DVDs and other wares."

ECF No. 103, ¶ 509. As noted above, however, "[t]he 'benefit' must be conferred by the plaintiff directly—indirect benefits bestowed by third parties will not support a claim for unjust enrichment." *Maxwell*, 2015 WL 1444388, at \*7. Any benefit received by Hagmann or any other Defendant as a result of the leveraging of Peschmann's article or her retractions would have been provided by third parties, and not by Peschmann directly.

Because Peschmann's allegations fail to support any of the elements of unjust enrichment, that claim should be dismissed.

> 10.    Count IX – False Light against all Defendants

Pennsylvania recognizes that publicity which places a person in a false light is a viable cause of action. *Graboff v. Colleran Firm*, 2013 WL 1286662, \*16 (E.D. Pa. Mar. 28, 2013), *aff'd*, 744 F.3d 128 (3d Cir. 2014) (citing *Fanelle v. LoJack Corp.*, 79 F. Supp.2d 558, 563 (E.D. Pa. 2000)). Pennsylvania has adopted the definition of false light invasion of privacy set forth in the Restatement (Second) of Torts, which describes the cause of action as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E; see also *Graboff*, 744 F.3d at 136 (holding that, to state a claim for false light under Pennsylvania law, a plaintiff must allege facts showing that the published material "is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity."). The standard set forth in subsection (b) of the Restatement mirrors the "actual malice" standard for defamation claims established by *New York*

38

*Times* and its progeny. *Taha v. Bucks Cty.*, 2015 WL 9489586, \*3 (E.D. Pa. Dec. 30, 2015) (citing *New York Times v. Sullivan*, 376 U.S. 254 (1964)). In fact, the Supreme Court has applied the "actual malice" standard to false light claims. *See Time, Inc. v. Hill*, 385 U.S. 374, (1967); *see also Coughlin v. Westinghouse Broad. and Cable, Inc.*, 603 F. Supp. 377, 389–90 (E.D. Pa. 1985) (finding that, where the plaintiffs failed to establish actual malice to sustain a defamation claim, they likewise could not survive summary judgment on the false light claim). Peschmann's false light claim should be dismissed.

Here again, Peschmann bases her claims of false light on the statements made and published by the Hagmann and Quayle. ECF No. 103, ¶ 518. These statements cannot support a claim of false light. Peschmann has not alleged that Defendants published any private facts about her. Such facts must represent "a major misrepresentation of [her] character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable [woman] in [her] position." *Curran v. Children's Serv. Ctr. Of Wyoming Cty.*, 578 A.2d 8, 12 (Pa. Super. Ct. 1990). It is recommended, therefore, that this claim be dismissed.

11.    Count X – Continuing Violations Doctrine against all Defendants

At Count X, Peschmann purports to assert a claim based upon violation of the "Continuing Violation Doctrine." ECF No. 103, ¶¶ 530-532. This doctrine is an "equitable exception to the timely filing requirement," *see West v. Phila. Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995), and applies "when a defendant's conduct is part of a continuing practice." *Randall v. City of Phila. Law. Dep't*, 919 F.3d 196, 198 (3d Cir. 2019) (quoting *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991)). Where applicable, this tolling doctrine will effectively extend the statute of limitations. In such cases, "so long as the last act [in] the continuing practice falls within the limitations period . . . the court

39

will grant relief for the earlier related acts that would otherwise be time barred." *See Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001). It does not, as the Defendants point out, create a cause of action. *See* ECF No. 107, p. 40. Peschmann does not dispute this. *See* ECF No. 111, p. 35 (no discussion of Count X). This claim, therefore, should be dismissed with prejudice.

12.    Count XII – Permanent Injunctive Relief against all Defendants

At Count XII[15] of the Second Amended Complaint, Peschmann seeks "immediate permanent injunctive relief" against all Defendants. In support of this relief, Peschmann alleges that the "Defendants & Does 1-20 are sincere sounding, malicious, and dangerous liars who reach millions of people and have weaponized the internet ... [and] as set forth herein, individuals who have believed and acted upon Defendants' and their Circle of Trust's 'news' are, in part, serving time in prison." ECF No. 103, ¶ 534. Peschmann demands that the Court enjoin this behavior. *Id.*

On its face, the injunction Peschmann demands represents an unconstitutional prior restraint. *See, e.g., New York Times Co. v. United States*, 403 U.S. 713 (1971) (refusing to enjoin publications of the "Pentagon Papers"); *Vance v. Universal Amusement Co.*, 445 U.S. 308 (1980) (per curiam) (holding that Texas public nuisance statute which authorized state judges, on the basis of a showing that a theater had exhibited obscene films in the past, to enjoin its future exhibition of films not yet found to be obscene was unconstitutional as authorizing an invalid prior restraint). A "prior restraint on expression comes ... with a 'heavy presumption' against its constitutional validity." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (quoting *Carroll v. President and Comm'rs of Princess Anne*, 393 U.S. 175, 181 (1968)); *see*

---

[15] The designation of this count appears to be a typographical error as it is actually the eleventh count of the Second Amended Complaint. No count designated as Count XI appears in the pleading.

40

*also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). Indeed, prior restraints are "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

When a prior restraint takes the form of a court-issued injunction, the risk of infringing on speech protected under the First Amendment increases. *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 764, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) ("Injunctions ... carry greater risks of censorship and discriminatory application than do general ordinances."). Although the Second Amended Complaint does not precisely define the scope of injunction Peschmann requests in this case, she appears to seek a broad restraint on Defendants' expression which, if issued, clearly would violate the First Amendment. Moreover, even if Peschmann were to limit the scope of the proposed injunction to allegedly defamatory statements, her request would remain facially invalid. See *Trivedi v. Slawecki*, 2012 WL 5987410, at *5 (M.D. Pa. Nov.28, 2012) ("The general rule is that 'equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages.'")

Count XII of the Second Amended Complaint should be dismissed.

III.    Permission to Amend

District Courts generally must allow a plaintiff leave to amend a deficient complaint prior to dismissal unless doing so would be futile. *See Gay v. City of Phila.*, 603 Fed. Appx. 87, 88 (3d Cir. 2015) (citing *Grayson v. Mayview State Hosp*. 293 F.3d 103, 108 (3d Cir. 2002)).[16] "'Amendment of the complaint is futile if the amendment will not cure the deficiency in the original [pleading] or if the amended [pleading] cannot withstand a renewed motion to dismiss.'"

---

[16] The Federal Rules also mandates that courts "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).

41

*Citizens Bank of Pa. v. Reimbursement Techs., Inc.*, 609 Fed Appx. 88., 95 (3d Cir. 2015)
(quoting *Jablonski v. Pan Am. World Airways, Inc.* 863 F.2d 289, 292 (3d Cir. 1988). As
explained above, it is recommended that several of Peschmann's claims be dismissed with
prejudice as any attempt at amendment would be futile. However, at this stage of the
proceedings, the same cannot be said for other claims. Given that Peschmann is proceeding pro
se and recognizing the Third Circuit's consistent emphasis on a liberal approach to pleadings as
embodied by Rule 15, it is recommended that she be given another opportunity to amend where
appropriate. *See, e.g., Endo Pharma v. Mylan Techs. Inc.*, 2013 WL 936452 (D. Del. Mar. 11,
2013).

This recommendation is not, however, without reservation. Peschmann has already
amended her Complaint twice. And the prolixity of her previous pleadings leaves this Court
with justifiable hesitation in recommending further amendment. Thus, if the Court agrees with
this Report and Recommendation and permits Peschmann further amendment to her claims, a
strict page limitation on that pleading would be appropriate.

IV.     Conclusion

In light of the foregoing, it is respectfully recommended as follows:

A.      Defendants' Motions to Dismiss as to Count I of the Second Amendment
        Complaint for defamation per se against Defendant Hagmann should be DENIED
        as to Hagmann's statements imputing criminal conduct to Peschmann and
        GRANTED in all other respects; and the Motion to Dismiss Count I for
        defamation against Defendant Quayle should be GRANTED and that claim be
        DISMISSED with prejudice because further amendment would be futile;

B.   Defendants' Motions to Dismiss as to Count II of the Second Amended
     Complaint (Fraudulent Misrepresentation) should be GRANTED and that Count
     should be DISMISSED without prejudice;

C.   Defendants' Motions to Dismiss as to Count III of the Second Amended
     Complaint (Negligent Misrepresentation) should be GRANTED and that Count
     should be DISMISSED without prejudice;

D.   Defendants Motions to Dismiss as to Count IV of the Second Amended
     Complaint (Intentional and Negligent Infliction of Emotion Distress) should be
     GRANTED and that Count should be DISMISSED with prejudice as any
     amendment would be futile;

E.   Defendants' Motions to Dismiss as to Count V of the Second Amended
     Complaint (Equitable Estoppel) should be GRANTED as to that Count and that
     Count should be DISMISSED with prejudice as any amendment would be futile;

F.   Defendants' Motions to Dismiss as to Count VI of the Second Amended
     Complaint (Civil Conspiracy) should be GRANTED and that Count should be
     DISMISSED without prejudice;

G.   Defendants' Motions to Dismiss as to Count VII of the Second Amended
     Complaint (Aiding and Abetting) should be GRANTED as to that Count and that
     Count should be DISMISSED without prejudice;

H.   Defendants' Motions to Dismiss as to Count VIII of the Second Amended
     Complaint (Unjust Enrichment) should be GRANTED and that Count should be
     DISMISSED with prejudice;

I.  Defendants' Motions to Dismiss Count IX of the Second Amended Complaint (False Light) should be GRANTED as to that Count and that Count should be DISMISSED without prejudice;

J.  Defendants' Motion to Dismiss Count X of the Second Amended Complaint (Continuing Violations) should be GRANTED and that Count should be DISMISSED with prejudice as any amendment would be futile; and

K.  Defendants' Motion to Dismiss Count XII of the Second Amended Complaint (Immediate Permanent Injunctive Relief) should be GRANTED and that Count should be DISMISSED with prejudice as any amendment would be futile

IV.  Notice

The parties are referred to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72(C)(2) for the appropriate procedure if any party desires to file objections to these findings and recommendations. Objections must be in writing and must be filed on or before Tuesday, August 27, 2019. Failure to file timely objections may constitute a waiver of appellate rights. *Angle v. Murin*, 2013 WL 5888272, at *1 (W.D. Pa. Oct. 31, 2013).

Respectfully submitted this 13th day of August, 2019.

RICHARD A. LANZILLO
United States Magistrate Judge